STATE OF MAINE *vs.* IGNAZIO ALBANES alias JOE BILL.

Oxford. Opinion June 6, 1912.

*Appeal. Cumulative Evidence. Declarations. ' Discretion. Error. Exceptions. Homicide. Issue. Limitations. Malice. New Trial. Reasonable Doubt. R. S., Ch. 135, Sec. 27.*

At the October Term 1911, of the Supreme Judicial Court for the county of Oxford, the respondent was found guilty of the murder of his wife, Rosina Albanes on May 11, 1911. He thereupon filed a motion for new trial, which was denied by the presiding Justice, and an appeal from this decision was taken to this court under R. S., Ch. 135, Sec. 27. Various exceptions were also reserved.

1. That the single question before this court on this branch of the case is whether in view of all the testimony "the jury were warranted in believing beyond a reasonable doubt and therefore in finding, that the defendant was guilty of the crime charged against him." *State* v. *Lambert*, 97 Maine, 51.

2. That a careful study of the occurrences which were either uncontroverted or which from the evidence the jury were warranted in believing took place, not only justified but demanded the verdict rendered. There was ample evidence both of implied and of express malice.

3. That it is the opinion of the court that the jury were warranted in finding that a husband who, armed with a revolver, fired three shots at his defenseless wife with no more provocation than is here revealed and especially after twice making threats to kill her if the divorce case which he had brought against her were continued, who turned and left her lying

upon the floor in the blood that was pouring from her wounds without attempting to ascertain whether she were living or dead, or to call a physician to her assistance, (although she lived three hours and regained consciousness before her death), but sought his own safety in delivering himself up to the officers, who never afterwards manifested the slightest remorse or even regret at his deed but rather continued to cherish his hatred towards her, for though a man of some property, when asked by the undertaker on the next day after the homicide when he wanted her buried, answered "tonight," and when asked in what price casket, told the undertaker to "bury her in a pine box" if he could not get a casket for ten dollars, is, according to the laws of Maine, guilty of murder and nothing less.

1. That the evidence of John Zacolli as to certain conversation he had with the deceased on the day before the shooting, offered "to show what she had to say about Joe Bill's manner" was properly excluded. It was merely hearsay.

2. That the ruling of the court that evidence charging the deceased with adultery "must be confined to acts occurring within one, two, three or four days prior to the homicide" was at the most harmless error. Such facts would not be admissible unless they were brought to the knowledge of the respondent, and no evidence was offered to that effect. Moreover the record shows that the respondent had been informed of his wife's alleged relations with one Nicola Balistin and had brought a libel for divorce against her on the ground of adultery. Harmless error, if such there was, should not be permitted to overturn a just verdict.

3. That, two of the leading citizens of Rumford having testified to the good reputation of the respondent in that community in which he had lived for the preceding ten years, the exclusion of the testimony of two witnesses to the same effect from Lewiston where he had lived for ten years prior to coming to Rumford was not reversible error. This inquiry under ordinary circumstances is confined to the place of residence at the time of trial, provided the residence there has been of sufficient length for a reputation to have been acquired.

Moreover the question of relevancy or irrelevancy on the ground of remoteness in time is a preliminary question to be determined by the presiding Justice in his discretion and his ruling will not be disturbed unless the discretion has been grossly abused.

Further, in this case, the evidence offered was merely cumulative, as this point was not challenged by the State, and the court has the power to impose a reasonable limitation upon the number of witnessses who shall be permitted to testify on the issue of character.

4. That the evidence of the undertaker as to the declarations of the respondent made on the next day after the homicide, in regard to the interment of his wife was admissible as bearing upon the question of express malice, its weight, being for the jury.

On appeal, motion and exceptions by defendant.   Appeal dismissed.   Motion and exceptions overruled.

The defendant was indicted for the murder of his wife, Rosina Albanes, and a verdict of "guilty as charged in the indictment" was returned by the jury.   The defendant then filed a general motion for a new trial which was denied by the presiding Justice.   The defendant then appealed to the Law Court under Revised Statutes, chapter 135, section 27, which provides that "if a motion for new trial in any case in which a person has been convicted of any offense for which the punishment is imprisonment for life, is denied by the justice before whom the same is heard, the respondent may appeal from said decision to the next law term; and the concurrence of but three justices shall be necessary to grant such motion."   The defendant also took various exceptions.

Memo.   It will be noted that under Revised Statutes, chapter 135, section 27, that the concurrence of only *three* of the eight Justices who constitute the Supreme Judicial Court, is necessary to grant a motion for a new trial in a case where a "person has been convicted of any offense for which the punishment is imprisonment for life."

The case is stated in the opinion, and dissenting opinion.

*William R. Pattangall,* Attorney General, *and Ralph T. Parker,* County Attorney, for the State.

*McGillicuddy & Morey,* for defendant.


SITTING:   WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, KING, BIRD, JJ.   HALEY, J., dissenting.                                    ,


CORNISH, J.   At the October Term 1911, of the Supreme Judicial Court for the county of Oxford, the respondent was found guilty of the murder of his wife, Rosina Albanes on May 11, 1911.   He thereupon filed a motion for new trial which was denied by the presiding Justice and an appeal from this decision was taken to this court under R. S., Ch. 135, Sec. 27.   Various exceptions were also reserved.   We will consider the appeal first.
*Appeal.*

The single question before this court on this branch  of the case is whether in view of all the testimony "the jury were warranted in

believing beyond a reasonable doubt and therefore in finding, that the defendant was guilty of the crime charged against him." *State v. Lambert,* 97 Maine, 51.

In this State degrees of murder have been abolished and the crime as now defined by R. S., ch. 119, sec. 1, is the unlawful killing of a human being with malice aforethought either express or implied.

A careful study of the occurrences which were either uncontroverted or which, from the evidence, the jury were warranted in believing took place, not only justified but demanded the verdict rendered. In fact a verdict for a less crime would have been a miscarriage of justice. The respondent was a man of mature years, a native of Italy, who had been in this country since 1887, and in this State about twenty years, ten of which were spent in Lewiston and ten in Rumford. His domestic relations had been unpleasant for several months because of his wife's alleged relations with one Nicola Balistiri, and the respondent had brought a libel for divorce against her on the ground of adultery, returnable at the May Term 1911 of the Supreme Judicial Court for Oxford county. On the 11th day of May a hearing was had in the court, then being held in Rumford, on the wife's motion for a continuance of the case to the October term, the motion being strenuously resisted by the husband. The presiding Justice granted the continuance. This was between 12.30 and 1 P. M. When the decision was announced the respondent's expression was noted. His face was "pallid and colorless." He went directly to his house, where his wife still lived, and ate dinner, his wife and a boarder being at the table. When the dinner was finished the boarder withdrew but the respondent remained. The wife was removing the dishes from the table and as he described it to the officer, she threw up her head, laughed, and said "I told you I would beat you, I could get my case put over to October." He told her to keep still but she continued to laugh at him, whereupon he drew a revolver and fired three shots, each of which took effect in her body as she faced him. She fell upon the floor and he left the house, sought an officer, and was placed in the police station at his own request. If malice in law can be implied from the intentional doing of a wrongful act or of an injury to another without legal justification or excuse, the implication exists here in full force.

But the State's case did not stop here. There was reliable evidence of express malice. On May 8, the attorney for the wife in the divorce proceedings met the respondent in the banking room of the Rumford Falls Trust Co. where the respondent signed and gave to the attorney a check for the amount due for attorney's fees and separate support pending the libel, as decreed by a Justice of this court at a prior hearing, and then repeated a most significant threat which he had previously made to his wife. The attorney's testimony is as follows: "While we were there he said to me, 'I have told my wife what I should do if she put the case over.' I replied to him that she had told me what he had said, that he said he would kill her; 'but' I says, 'Joe you won't do that.' He says, 'I shall kill her if the case is put over.'" Here then we find a threat made first to the wife herself and then to her attorney, a threat which was carried into fatal execution three days later within an hour after the case was "put over" by order of the presiding Justice.

All the requirements of murder have been met, premeditation, malice and the killing.

But the defendant seeks to reduce the crime to manslaughter by injecting into the wife's remarks which preceded the shooting, the assertion that the baby in the cradle did not belong to him but to Nicola, and that this remark coupled with some letters in his possession showing their guilty relations, released the clutch on his mental machinery and caused him to fire the fatal shots in the heat of provoked passion. What his wife actually said was a question of fact for the jury to decide, and they were warranted in taking the State's view. The evidence comes on the one side from the officer to whom the respondent made his statement soon after the homicide, and on the other from the respondent himself when on the stand. The officer testified that he never heard of the taunt in regard to the paternity of the child until he heard it in court. The repondent's testimony on this point lacks probability. It would hardly seem reasonable that the wife who was contesting the divorce should admit the charge on which it was based; while the testimony of the officer is perfectly consistent with what had been the immediate subject of contention between the respondent and his wife, viz, the postponement of the trial of the libel. So far as the letters

were concerned, the respondent admits that they had been in his possession since the previous September or October and had at least been partially translated to him before the full translation a few days prior to the shooting. Of their purport he must have been fully aware, and there could have been no sudden shock brought on by the news of his wife's infidelity that swept away his reason, because in the libel for divorce which he had signed and brought on the third day of April, the sole cause alleged was adultery. The respondent therefore for a long time prior to the 11th of May, had believed his wife to be unfaithful and was attempting to divorce her on that ground. If his testimony of her statement to him was true it revealed little that was new to him. But the probabilities are strongly against its ever being made.

Without discussing the evidence further it is the opinion of the court that the jury were warranted in finding that a husband who, armed with a revolver, fired three shots at his defenceless wife with no more provocation than is here revealed, and especially after twice making threats to kill her if the divorce case were continued, who turned and left her lying upon the floor in the blood that was pouring from her wounds, without attempting to ascertain whether she were living or dead, or to call a physician to her assistance, (although she lived three hours and regained consciousness before her death), but sought his own safety in delivering himself up to the officers, who never afterwards manifested the slightest remorse or even regret at his deed but rather continued to cherish his hatred towards her, for though a man of some property, when asked by the undertaker on the next day after the homicide when he wanted her buried, answered "tonight," and when asked in what price casket, told the undertaker to bury her in a pine box if he could not get a casket for ten dollars, is, according to the laws of Maine, guilty of murder and nothing less.

*Exceptions.*

Although several other exceptions were taken only three were pressed in argument, viz:

1. The exclusion of certain evidence of John Zacolli, offered by the respondent as to what conversation he had with the deceased on the day before the shooting and when objected to by the State, the counsel for the respondent stated the object of the testimony as

follows: "I wish to show what she had to say about Joe Bill's manner." The ruling was correct. The evidence offered was merely hearsay and clearly inadmissible. In this connection the counsel challenged the ruling of the court, that on the question of admissibility of evidence charging the deceased with adultery, "they must be confined to acts occurring within one, two, three or four days prior to the homicide." No specific evidence was offered on this point and ruled upon, and had the same been offered it would properly have been excluded unless knowledge of the facts could have been brought home to the respondent by other evidence. The mere facts were not admissible per se. Knowledge of them by the respondent would have been, but the record is silent as to any offer to connect such facts with the respondent.

Moreover the exclusion was harmless in any event because the record shows that the respondent had been informed of his wife's relations with Nicola long before and on that information had brought his libel for divorce. Harmless error if such there was, should not be permitted to overturn a just verdict.

2. The second exception is based upon the exclusion of certain evidence offered by the respondent tending to show his good character. The respondent had raised this question as he had a legal right to do and had been permitted to introduce the testimony of two of the leading citizens of Rumford who had known him during the preceding ten years that he had lived in that town. The respondent then offered the testimony of two other witnesses who lived in Lewiston, to testify as to his reputation while in that city during a period from ten to twenty years prior to the trial.

In other words the respondent was permitted to introduce evidence of his general reputation for peaceableness in the community in which he then lived and had lived for a period of ten years, but evidence of his reputation in another community which he had left ten years before was excluded. There was no error in this ruling. The inquiry under ordinary circumstances is confined to the place of residence at the time of trial provided the residence there has been of sufficient length for a reputation to have been acquired. This is especially true where the evidence so offered is not controverted by the other side. If a person has lived but a short time in a community it might be proper and even necessary to go to

his former home in order to establish his reputation. But that is not this case. Rumford had been the respondent's home for ten years, his reputation was well established and under these circumstances to go back to a prior home was too remote both in time and place. Moreover it is well settled that whether the evidence, offered to show a person's reputation, is irrelevant because too remote in time or the community is too distant in space, is a preliminary question to be determined by the presiding Justice in his discretion, and his ruling on this point will not be disturbed unless the discretion has been grossly abused. And further, the court has the power to impose a reasonable limitation upon the number of witnesses who shall be permitted to testify on the issue of character.

These are all familiar principles of evidence. 3 Ency. Ev. p. 30-32; Cyc. Vol. 16, p. 1276 et seq.; *State* v. *Potts*, 78 Iowa, 756, 5 L. R. A., 814, and they were carefully observed in this case. The respondent had the benefit before the jury, of the evidence of two of his neighbors who had known him in Rumford for the past ten years, and their statements were not attacked by the State. Certainly he was not prejudiced because the inquiry was not extended further and two other witnesses who had known him at a remote time and in a somewhat distant place were not permitted simply to corroborate them. Their evidence at most was merely cumulative.

3. The third exception rests upon the admission of the evidence of one Voter, an undertaker and a witness for the State, as to a conversation which took place the next day after the homicide and which has already been referred to. The testimony is as follows:

A.   I went to the lock-up to ask him what he wanted done with the remains of his wife.

Q.   What did he say?

A.   I asked him when he wanted her buried. He says "tonight." I told him I couldn't do it on such short notice as that. . . . I asked him what price of casket he wanted. He said, "Put her in a ten-dollar one." I told him I had never seen one like that; we didn't have any at that price. He says, "If you haven't got one, telephone for one." I says, "I don't know where you can get a casket for that price." ·He says, "Then put her in a pine box." ·

In his charge the presiding Justice instructed the jury to disregard this testimony, but this caution was unnecessary, because

the evidence was admissible as bearing upon the question of express malice, tending to show the attitude of mind at the time of shooting, its weight, of course, being for the jury. This conversation took place twenty-four hours after the shooting. The respondent had had time to repent, if the deed had been done in the heat of passion. But his words indicated neither regret nor remorse but continued hatred.

Upon the question of express malice his heartless replies were clearly admissible. *Wilkinson* v. *Drew,* 75 Maine, 360; *Spear* v. *Sweeney,* 88 Wis. 545, 60 N. W., 1060; *Lewis* v. *State,* 29 Tex. App., 201, 15 S. W., 642; *Duncan* v. *Commonwealth,* (Tex.) 12 S. W., 672.

A careful study of the whole record fails to reveal any error on the part of court or jury and therefore the entry must be,

> *Appeal dismissed.*
> *Motion for new trial denied.*
> *Exceptions overruled.*
> *Judgment for the State.*

HALEY, J. Dissenting. I do not concur in the opinion of the majority of the court, and many careful readings of the case convince me that the defendant is entitled to a new trial. My convictions are so firm that I desire to state my reasons, and enter my protest against what seems to me to be a wrong done the defendant.

At the October term, 1911, of the Supreme Judicial Court, in the county of Oxford, the respondent was found guilty of the murder of his wife on May 11th, 1911. He thereupon filed a motion for a new trial, which was denied by the presiding Justice, and an appeal from his decision was taken to this court under R. S., chapter 135, section 27. Various exceptions were also reserved at the trial.

In this State different degrees of murder have been abolished, and the crime is now defined by the revised statutes as the unlawful killing of a human being with malice aforethought, either express or implied. Chap. 119, sec. 1, R. S.

Manslaughter, by chapter 119, section 2, R. S., is thus defined:

"Whoever unlawfully kills a human being in the heat of passion, on sudden provocation, without express or implied malice afore-

thought, or commits manslaughter as defined by the common law, shall be punished by imprisonment for not more than twenty years, or by fine not exceeding one thousand dollars."

Upon the question of appeal the opinion states the single question before this court on this branch of the case is whether, in view of all the testimony, the jury were warranted in believing, beyond a reasonable doubt, and therefore finding, that the defendant was guilty of the crime charged against him. *State* v. *Lambert,* 97 Maine, 51. That undoubtedly states the rule of law governing cases of this nature, but cases may arise which require it to be stated with some modification. The jury being judges of the facts, if the trial was conducted according to the rules of law, and there was testimony which justified the jury in believing, beyond a reasonable doubt, that the defendant was guilty, this court upon appeal has no right to substitute its judgment for the verdict of the jury; but if the trial was not conducted according to the rules of law, if it was conducted in such a manner that testimony was admitted which was inadmissible, and did not bear upon the guilt or innocence of the accused, and the only result of which was to prejudice the jury against the defendant; if testimony was excluded which was admissible, if the Justice who presided at the trial neglected to give the jury the instructions which the law requires, then the question before the court, upon appeal, as this case is: Did the defendant have a fair trial? Did the inadmissible evidence, the rulings of the court excluding evidence and admitting evidence, and the neglect to give proper instructions, tend to prejudice the jury against the defendant's case so that, but for those errors, the jury would have been justified in returning a verdict more favorable to the defendant than the verdict which was returned?

The defendant was entitled to a verdict of the jury, uninfluenced by prejudice or inadmissible testimony, and to proper instructions by the court. If inadmissible testimony was introduced, which the jury was instructed to consider, and the instructions to which he was entitled were not given, then this court cannot say that the neglect to charge the jury as required by law, did not prejudice them, and that, if they had disregarded the inadmissible testimony, they would have returned the verdict they did, because but for that evidence and the errors of the court, they would have been justified

in finding, and might have found, the defendant guilty of manslaughter.

It is urged that the errors to which I shall refer were open to the defendant upon exceptions, and as he failed to take exceptions, or request the instructions he was entitled to as to manslaughter, this court cannot consider them upon appeal. A very plausible reply, but my answer to that is that no government in a civilized country should ask for a conviction of the crime of murder upon technicalities. To do so would be abhorrent to every principle of justice. The party accused, in fighting for his life, may be justified in relying upon technicalities, but the government, never. To hold otherwise would be to make a trial for murder a contest in which liberty for life is the stake, to depend, not upon the guilt or innocence of the accused, but upon the skill of the counsel engaged in the trial, and the court, instead of protecting the accused and seeing that he had a fair trial, would only be concerned in the points scored and the blunders made by opposing counsel, and by his neglect to give proper instructions to the jury, if counsel were negligent in claiming exceptions, and by admitting inadmissible testimony, instead of aiding the jury in the discovery of the truth and assisting them in arriving at a just verdict, would prevent a fair trial of the accused.

It was the duty of the court to exclude inadmissible testimony, to admit admissible testimony, and to give proper instructions to the jury, and, although the defendant had the right of exception for the failure of the court to do so, this court, upon appeal, must look to the whole record, and, if the errors were such that the defendant was, or might have been, prejudiced, then the court cannot say he has had a fair trial, and cannot say that, but for such irregularities, the jury might have returned a verdict of manslaughter.

Was inadmissible evidence admitted that had a tendency to and might have influenced the jury against the defendant?

Mr. Hutchins, a witness called by the government, upon cross examination was asked if he had not been circulating stories that the defendant had killed a person in another state, and admitted that he had. The State then questioned the witness as follows:

"Q. Now Mr. Hutchins, he has referred to this matter, and I wish you would tell the jury just what *you have heard?*

"WITNESS: Would it be admissible, your Honor?

"COUNTY ATTORNEY: He has opened it up, if the Court please.

"The COURT: You may answer.

"A. I have heard from the police of Rumford that the Chief of Police of the town of Rumford had a communication from the Chief of Police of another city asking whether Ignacio Albanese, who is known in Rumford as Joe Bill, was the same Ignacio Albanese who killed a party at Buffalo, New York; and I had previously had information from Mrs. Joe Bill herself covering this same event. She told me in the month of March, last March, that Joe Bill had told her that he had killed a woman in or near Buffalo when he was living there at Buffalo. She told me that he had described to her how he escaped from that place in the night under the cover of the woods, guided by the stars; that he hid in the woods during the day time; that he ate roots and leaves, not daring to come out in the open; that he finally reached Albany, went to New York City, to Boston, and came to Lewiston, Maine, where he was known as Joe Bill. She told me this several times, and she said that he had told her on several occasions; that he went into details more when he had been drinking than he did when he was sober. That is all I know about it. I have never mentioned it to a member of either panel nor in their presence. I have mentioned it to members of this Bar and to one of the defending counsel.

"Q. When did you hear of this letter to the Chief of Police?

"A. Since I came to Paris to attend this term of court.

"Q. And it has been since that letter that you say you heard the Chief of Police had, that you circulated these stories?

"A. I have told my associate counsel, Mr. Swasey, before this time; but up to that time without any corroborating evidence I have kept silent what a client had told me.

"Q. Did you take pains to hunt up this letter and see it yourself?

"A. I took pains before announcing any information on the subject to see a man who said he had read it, a selectman of the town of Rumford, L. H. Veillieux.

"Q. And you did not go to the police to find out about it?

"A. I have since consulted the Chief of Police, Mr. Violette, and although I have not seen the letter, he has stated to me its contents.

"Q. You never have seen the letter?

"A. I have not."

It is not pretended that the above testimony was admissible. Even the witness protested to the court against giving it, but the court ruled that he should answer the question as to what *he had heard*. Not a sentence of that testimony was admissible, and, taken in connection with the testimony given by the same witness in answer to this question, "Referring to the above testimony, I ask you if you claim it is true? A. In my opinion it is," it shows that not only was hearsay evidence admitted, but admitted to prejudice the jury against the respondent by accusing him of the crime of murder twenty years before the offense charged. Also into the scales was placed the opinion of Mr. Hutchins, a citizen of the county, that the defendant was guilty of the acts recited by him in his inadmissible testimony! It is true no exceptions were taken to its admission, but a reading of the case shows that the court was determined that it should be admitted—admitting it against the protest of the attorney for the defense and against the protest of the witness who gave it, its only effect could be to prejudice the jury. And this court cannot say what effect that prejudice had upon the jury in arriving at the verdict which it returned. And again I say that, although the defendant did not take an exception to the admission of this testimony, the government should not ask for a conviction of the respondent for the crime of murder upon technicalities, and this court, upon a review of the whole case, cannot say that, but for that testimony, the jury might have arrived at the conclusion that the defendant was guilty of manslaughter, as claimed by his counsel, and not guilty of the crime of murder.

The opinion of the court sets forth fairly the claim of the government as to the commission of this crime. Afterwards, in different parts of the opinion, it refers to some things claimed by the defense; but in order to determine whether the defendant had a fair trial, it is well to also consider the position of the defense.

The defendant was a native of Italy, and had been in this country since 1887, and in this State about twenty years, ten of which were spent in Lewiston and ten in Rumford. His domestic relations had been unpleasant for some months because of his wife's alleged

relations with one Nicola Balistiri, and the respondent had brought a libel for a divorce against her on the ground of adultery, returnable to the May term of the Supreme Judicial Court for Oxford County. On the 11th day of May a hearing was had in the court on the wife's motion for a continuance of the case to the October term; the motion being resisted. The Justice presiding granted the continuance. The defendant claimed that he had received two letters from his wife's uncle in Italy, to whom he had loaned money, that he was unable to read them, and that they were finally translated to him at about the time of the hearing on the motion for a continuance of the libel for a divorce, and that the letters were such as to arouse his passion; that the respondent had taken the children from their mother and sent them to an asylum in Portland, on account of the mother's conduct; that an infant child was not taken with the other children, but left in the same house with the respondent and his wife, although they did not live together as husband and wife; that at about the same time the letters from the uncle in Italy were translated, the respondent also had the possession of and was informed of the contents of a letter from the wife's lover Nicola, and of a letter from his wife to Nicola; that immediately after the hearing on the divorce matter, the respondent went home; that his wife got dinner for him and his hired man, and the wife having been informed that the case had been continued, tantalized and taunted him with the fact, saying, "I told you I would beat you," and that the respondent replied to her, "Do your business and nobody say anything now," but that she kept on laughing and said, "I beat you any time I want to," and that she continued laughing and taunting him, telling him that she could beat him. Then, finding that that did not arouse him, she said, "You see that baby? That no belong to you; it belong to Nicola. I going to put you on the dirt before you get through, and after I put you on the dirt I going to marry Nicola." The respondent claims that at those words, with what he knew of his wife's conduct, the letters of her uncle, Nicola's letter to her and her's to Nicola, he lost control of himself—aroused by the taunt that the child that he had held in his arms and caressed as his own child was not his own, but was the fruits of an illicit love of his wife's, and that then, in the heat of passion, he shot his wife. This is the position of the defense.

If it is true, and if the jury were not satisfied beyond a reasonable doubt that it was not true, then it needs no citation of authorities to show that the killing was not murder, but manslaughter.

After the people arrived at the house, Mrs. Bill was informed that she was dying, and was asked if she wanted to make a statement, and, in answer to questions put to her, stated that the defendant shot her three times.

The State then offered evidence of other statements made by her after her statement that the defendant had shot her three times; and, under the ruling of the court that "any statements she made while knowing that she was at the point of death, are admissible," the witness was allowed to testify "that she said that Lawyer Hutchins telephoned her at noon time that Joe Bill was mad and was going to kill her, and was going up to the house, and for her to get out of the house as soon as she could, and she said she was going just as soon as she could get some clothes together." This was not in the presence of the accused, and was the introduction of threats by the defendant that no one had testified to his making, and was not a part of the declaration connected with the homicide, and was clearly inadmissible.

"The declarations of the deceased are admissible only to those things to which he would have been competent to testify if sworn in the case." Greenl. Ev. sec. 159.

"But courts have refused to extend the rule beyond the cause and circumstances of death." *State* v. *Wood,* 53 Vt., 560.

"Dying declarations, when they relate to former distinct transactions and embrace facts or circumstances not immediately connected with the declarant's death, are inadmissible. They are admissible only as to those things to which the deceased would have been competent to testify." *State* v. *Baldwin,* 79 Ia., 714.

"The rule is well settled as to the class of declarations admitted as dying declarations. Declarations of facts stated by the deceased must be such as he would be permitted to testify to if a witness." *Hall* v. *State,* 132 Ind., 317.

Under the above authorities the statement by the deceased of her conversation with Lawyer Hutchins and the threats of her husband and of what she was about to do, were inadmissible, and prejudiced the defendant's case.

It is urged that the inadmissible testimony did not work prejudice to the defendant, as the other evidence was sufficient to justify the jury in returning the verdict they did. In *State* v. *Westfall,* 49 Ia., 328, which was a case where the defendant was convicted of murder in the second degree, the court disposes of the same objection in the following language:

"The attorney general does not contend with great confidence, that the evidence was admissible, but he insists that its admission did not work prejudice to the defendant, for the reason that the other evidence, apart from this now under consideration, was amply sufficient to authorize the verdict. But his position is unsound. Without the illegal testimony the jury may not have found the verdict for the State. This testimony may have made the complement of proof which satisfied their minds. In that case the defendant would have been convicted upon illegal evidence. This court cannot determine what quantity of evidence was lawfully sufficient to authorize the verdict."

In the absence of the jury, counsel argued the question of the admissibility of evidence charging the deceased with adultery, and the court ruled that, "under the authorities, the testimony must be confined to acts occurring within one, two, three or four days prior to the homicide."

If acts showing the adultery of defendant's wife were admissible, as the court held they were, the ruling limiting such acts to within four days of the time of the homicide was error. It being the claim of the defendant that his wife's past conduct and action on the day of the murder so far aroused his anger that, in the heat of passion, he shot her, and if evidence of her adultery within four days of the shooting was admissible as tending to show how, with her taunts, he might have become so angry as to lose control of himself, evidence of her adultery five days before was admissible for the same purpose, and the rule of law is that her conduct for a long time prior to the homicide, if brought home to the knowledge of the defendant, was proper to be proved, and to be considered by the jury in connection with the other facts as showing that he might, as claimed by himself, have lost control of himself; that all her acts, together with her taunt in regard to the parentage of the child, took from him his reason, and the jury had the right to consider all that

evidence, and the limiting of the acts of adultery of the defendant's wife to four days before the homicide cannot be defended upon any rule of law.

The defendant admitted the killing, and claimed that his wife's conduct in the past, the letter from her uncle, her letter to her lover that day translated to him, her language after dinner taunting him and informing him that his supposed child was that of her paramour, altogether was such, that it aroused his passion to that extent that he lost control of himself, and in the heat of passion, caused by her acts and her language he, without malice, caused her death, and the jury, if they believed his statement of the tragedy, would have been justified in returning a verdict of "Guilty of manslaughter."

No instruction was given by the court to the jury in regard to manslaughter. All that the court said was: "The defendant, however, through his able counsel, admits the killing, but says that it was manslaughter as defined by the statute which has been read to you (not by the court) ; that it was the unlawful taking of a human life in the heat of passion and on sudden provocation, without malice aforethought, either express or implied, and he urges the statute of this State in his plea that it was manslaughter instead of the higher degree on the ground that while a voluntary manslaughter occurs where one unlawfully kills intending to kill, but under such circumstances as he has described, the law, in its tender mercies for the frailties of human kind, mitigates the crime from murder to manslaughter."

It was the duty of the court to so fully instruct the jury, upon every degree and kind of crime of which the accused might be convicted under the indictment, as to give him the benefit of having the evidence considered by the jury, with full knowledge of the law as to the essential characteristics of each kind and degree of crime for which a verdict might be returned against him.

In *State* v. *Meyer*, 58 Vt., 457, the defendant was tried on an indictment for murder. The defendant, in the fifteenth request, asked the court to charge, "If the jury should find that the respondent killed Herman Krause, in the absence of any proof of malice or premeditation, they are at liberty to find him guilty of murder in the second degree, manslaughter, or to acquit him." The court

so instructed the jury, and also instructed them as to what constituted murder in the first degree, and the statement of the statute that all other kinds of murder should be murder in the second degree, and telling them what was the punishment for murder in each degree and the punishment for manslaughter, and then explained to the jury what constituted the crime of murder; also what constituted the crime of manslaughter, but did not explain to the jury what constituted murder in the second degree, or wherein murder in the second degree differed from murder in the first degree. The court say: "The reading of the statute declaring what was murder in the first degree, and that all other kinds of murder shall be murder in the second degree, was not a sufficient explanation of the two degrees. Upon an indictment for murder, where the jury may convict the respondent of murder in the first degree, and second degree, or manslaughter, the State, to convict of murder in the first degree, must first overcome by evidence the presumption of innocence that always shields the respondent until the contrary is proved beyond a reasonable doubt, and when that is overcome, the State must next overcome every reasonable doubt that the crime which the respondent has committed is not manslaughter nor murder in the second degree, advancing from the lesser to the greater crime, the presumption to be first in favor of innocence, and then of the lesser crimes in their order. And it was the duty of the trial judge to so fully instruct the jury upon every degree and kind of crime of which the respondent may be convicted under the indictment as to give the respondent the benefit of having the evidence considered by the jury under a full knowledge of the law as to the essential characteristics of each kind and degree of crime for which a verdict may be returned against him, so that he may have the benefit of every reasonable doubt that may arise, both as to the commission of crime and as to the kind and degree of it. . . . The respondent was entitled to a full explanation to the jury of what constituted each degree of murder, and the distinguishing characteristics of each. This the learned Judge wholly neglected to give, and as this neglect and omission might have been prejudicial to the respondent, it was error."

In this case the respondent was entitled to a full explanation of what constituted manslaughter under the laws of Maine, and, as

the learned Judge wholly neglected to give such instruction, his neglect and omission may have been prejudicial to the respondent, and it was error.

The above case was before the court upon exceptions, but, as the fifteenth request was given in the language that it was asked for, the court must necessarily have believed that it was the duty of the court to go further and define the various kinds of crime of which the defendant might have been convicted, and the fact that the case was taken up on exceptions does not change the rule of law in regard to the duty of the court as to instructing the jury, and the right of the defendant to have proper instructions.

It is stated in many cases that the defendant upon appeal cannot take advantage of the admission of illegal testimony, the excluding of the legal testimony, or neglect by the court to give proper instructions, unless he took exceptions at the time of the admission or exclusion of the testimony, or requested the proper instruction and excepted to the refusal of the court to give the instruction. It should be so when the evidence admitted, excluded, or instruction not given, does not materially affect the case; technicalities which do not go to the merits of the case may well be considered as waived, unless raised at the proper time; but inadmissible testimony, or the exclusion of legal testimony, that goes to the merits of the case, or neglect to give the instructions that the defendant is entitled to, should not be within that rule, and the defendant should have the right upon appeal to take advantage of errors that effect the merits of his case.

In *State* v. *Beal,* 82 Maine, 284, the defendant was convicted of murder in the first degree, and the case was before this court upon appeal. The opinion states: "At the bar, a new trial was urged solely upon the ground of evidence newly discovered. The motion was not pressed for any other cause; nor does the court, after a careful consideration of the whole evidence, see any good reason why it should have been. The trial seems to have been a fair one. The charge of the Justice was plain, and easy to be understood by the jury. . . . The court is of opinion, after a careful consideration of the whole case, that no just cause has been shown why the appeal should be sustained."

By the opinion it seems that the court carefully examined the whole case and found no errors. They found that the defendant had a fair trial, which means a trial where illegal testimony was not admitted, when legal testimony was admitted. They found the charge to the jury plain and fair and covered the case and included the instructions the defendant was entitled to as a matter of law. There are many well considered cases that hold that the court upon appeal will consider the errors of which the defendant complains, and which are in line with the opinion in *State* v. *Beal,* supra.

In *Connor* v. *State, 23* Texas Criminal Appeals, 378: *held:* "The failure to define murder of the second degree in a case where the jury, upon the evidence, might have found the defendant guilty of the less offense, will be cause for reversal, whether the instructions were asked or not."

In *People* v. *Rodawald,* 177 N. Y., upon page 428, the court say: "Only errors raised by exception require a new trial, and it is only when we are satisfied the verdict was against the weight of evidence, or against law, or that justice requires a new trial, that we are permitted to reverse, whether exceptions have been taken or not in the court below." *People* v. *Tobin,* 176 N. Y., 278.

In *Sutton* v. *State, 2* Texas Criminal Appeals, 342: "But in view of the evidence adduced on the trial, and bearing in mind the nature of the defense necessarily relied on, we are of the opinion the rights of the accused were prejudiced by the failure of the court to charge the law of self defense otherwise than with reference to threats against the accused. Proper instructions on this subject were required by the evidence as a part of the law of the case which the Judge should have given, whether asked or not." *Citing Marshall* v. *State, 40* Texas, 200.

In *Honesty* v. *Commonwealth,* 81 Va., 283: "It is well said that the accused has a right to a full and correct statement by the court of the law applicable to the evidence in the case, and that any misinstruction by the court in point of law or matters material to the issue, is ground for a new trial."

In *Potter* v. *State, 85* Tenn., 88, the defendant was tried for the crime of murder, and it was assigned as error that the court failed to instruct the jury in regard to threats of the deceased communi-

cated and uncommunicated to the defendant. For the State it was urged that this omission was not error,

First,—"Because the finding of the jury that the offense was murder in the first degree negatives the idea that they considered the act as committed under any other circumstances justifiable or excusable, and the facts sustained the verdict."

Second,—"That no instruction on this point was asked, and therefore need not have been given."

The court say: "As to the first of these objections, it is sufficient to say that a verdict cannot negative the existence of a defense the jury was not properly instructed to consider, and we are not satisfied that the facts sustain a verdict which is not the result of the deliberate judgment of the jury after a full, fair and proper exposition of the law in a case involving the life of the citizen or his hopeless consignment to servitude and infamy. In such case this court would not stand upon any too nice technicalities of requiring the defendant to have demanded any instruction essential to a fair trial, which the law is supposed to guarantee to him without a demand, in order that he should be entitled to it. It is the duty of the circuit Judge to charge the law applicable to the evidence, and to give the defendant the benefit of it, and not decide for himself the case he supposes to be made out and apply the law to such suppositious case and leave to the jury only that of decision and to us to speculate on its effect and the possible injury, or want of injury, done the defendant. In this case it can be clearly seen that the omission to charge the law is as vital an error as it would have been to have charged it incorrectly, and we hold that the defendant was entitled to have it given without demand. We by no means intend to intimate that such is, or is to be the rule in ordinary cases, or in less 'vital omissions; but where life is to be taken, or devoted to punishment and the omission as serious as the affirmative injury of an erroneous charge, the verdict will not be allowed to stand."

*People* v. *Barberi,* 149 N. Y., 256: "In reviewing a capital case we must be satisfied that a fair trial has been had, and when we see that the case has been tried and submitted to the jury upon an erroneous theory, prejudicial to the accused, and which had a controlling influence upon the trial and the results, we ought to regard the principle which has been decided, rather than the concrete form

in which the question arose and became a practical one at the trial, and should not be astute to seek for some technical ground not urged upon the trial or here to sustain the ruling. . . .

Those portions of the charge are also fairly covered by the exceptions, and, even if they were not, an erroneous statement of the law, or improper comments upon facts, or the evidence bearing upon them, may be reviewed and corrected in this court in a capital case without exceptions, when it can be seen that they operated to the prejudice of the accused. . . . From an examination of the whole case, we are impressed with the conviction that the defendant has not had a fair trial, and that it should be submitted to another jury to the end that all competent proof may be given in the regular and orderly way, and all the questions presented in that temperate and dispassionate manner which is so important in the trial of a capital case, and so essential to the protection of all the rights of the accused."

Also see *State* v. *Westfall,* supra; *State* v. *Meyer,* supra.

To me it seems that an examination of the case shows that the defendant did not have a fair trial; that there was error in admitting testimony, in excluding testimony, and in the neglect to give the instruction to the jury that the defendant was entitled to; that those errors were prejudicial to the defendant, and that this court can and should review and correct them upon this appeal, and grant the defendant a new trial.