## STATE OF MAINE

*vs.*

## MICHAEL J. MULKERRIN, alias MICHAEL MULKERN.

Cumberland.   Opinion January 12, 1915.

*Appeal.   Homicide.   Imminent Danger.   Justifiable Self Defense.   Malice.
Murder.   Revised Statutes, Chap. 135, Sec. 27.   Threats.*

1.   Upon an appeal by one convicted of murder from the overruling of his motion for a new trial, the only question to be determined by the Law Court is whether the jury were warranted by the evidence in believing him guilty, beyond reasonable doubt.

2.   In this case, the evidence is ample to warrant the conclusion that the homicide which was admitted, was premeditated and deliberate.

On appeal by respondent.   Appeal denied.   Judgment on the verdict.

The respondent was tried on an indictment for the murder of Patrick J. Mulkerrin, at the September term of the Superior Court, 1914, for Cumberland County, and was convicted.   He filed a motion for a new trial, which was overruled by the presiding Justice, and he thereupon appealed from that decision.

The case is stated in the opinion.

*Scott Wilson*, Attorney General, *and Samuel L. Bates*, County Attorney, for the State.

*Jacob H. Berman, Harry E. Nixon, and Benjamin L. Berman*, for the respondent.

SITTING:   SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, HANSON, JJ.

SAVAGE, C. J.   The defendant was convicted of murder.   His motion for a new trial was overruled by the presiding Justice, and the case comes before us on appeal from that decision.   R. S., Chap. 135, Sec. 27.

The defendant admitted the killing, and interposed the defense of self defense. And in addition he now contends that if he was guilty of anything, it was only manslaughter. No exceptions have been reserved, and the only question now before us is whether, in view of all the testimony in the case, the jury were warranted in believing beyond a reasonable doubt, and therefore in finding, that the defendant committed the homicide with malice aforethought express or implied. *State* v. *Lambert,* 97 Maine, 51; *State* v. *Albanes,* 109 Maine, 199.

We think the jury might well have found the following facts:— The defendant and the deceased were brothers. On the evening of the homicide, the defendant approached a police officer on the street and said his brother, the deceased, had been chasing him with bricks, and that he wanted protection; that the officer told him to go to the police station and swear out a warrant, and that the brother should then be arrested; that the defendant replied, "I don't care anything about the station or court; I want protection;" that he refused to swear out a warrant; that he was very much excited; that a few moments later he said to the officer "I will get a gun and I will shoot the son of a bitch;" that he then went to his sister's house, where he was living, changed his clothes, took a revolver from a drawer in his sister's room, put it in his hip pocket, and went to his brother's stable, arriving there not more than fifteen or twenty minutes after he left the officer. All of this, except the threat to shoot, is admitted by the defendant. There was also believable evidence that after the homicide he said to the same officer in effect "I told you I would shoot him and I did."

What actually took place in the stable is in dispute. The dying declaration of the deceased was admitted in evidence. And since its admission was hotly contested, we will add that it was properly admitted. The dying declaration was in these words:—"I was standing in the stall, facing the manger. I was shot from the back. I looked around; I see Mikey (the defendant) and he fired five or six more shots, and he says 'I will kill you, you bastard.'"

The defendant's story, so far as it is material to the vital issue, is in these words:—"I went into the barn, and Pat, (the deceased) was standing right up near the door, and I says to him 'Pat, if you don't leave me alone I am going up to swear out a warrant for you and protect myself, and I will carry a gun to protect myself.' I walked

in the barn, and he walked way back in the barn kind of like in the stall, and he hit me with a broom, and then he run out to the door, and he shut the door, and he hugged for me. I said 'If you don't let me go, I will shoot you,' and so he kept hugging, and I fired the gun and shot him. I knew he would kill me if he got the gun. He told me 'I will kill you Mikey.' I knew he would kill me. After that he dropped on the floor." On cross-examination the defendant testified that he went to the stable looking for his brother, that the brother saw him before he went in, but said nothing; that the brother went to the back of the stable as soon as he saw him come in, and still said nothing; that he, the deceased, walked into the last stall, "kind of hid in the last stall," that after he, the defendant, said he would make complaint and get a gun, the brother came running out and shut the stable door quick and hit him with a broom; that the brother said "I have got you now where I want you, I will kill you;" that the defendant showed him the revolver, and said "If you try any funny work, I will use it;" that "he came up to me, started to hug me, and I let the shots go off;" that the brother had grabbed him, was holding his arms to his side and was trying to take the revolver; that he got his hand free and fired three shots at his brother. He says "I had it right up close to him." Being asked, "Bodies close together? He was hugging you right up tightly?" he answered "Yes, sir, tight."

The defendant introduced a great mass of evidence tending to show that the deceased was a quarrelsome, violent, dangerous man, that he had chased the defendant with bricks that very evening, that on previous occasions he had chased him with bricks, cobble stones and knives, that he had threatened his life, and once had fired a revolver at him.

If the defendant's story of the homicide is a true one, the previous conduct of the deceased, if the testimony is true, would go far to show that the defendant had reason to believe that he was in imminent danger of great physical harm, or even of loss of life, at the hands of the deceased. And this is one important element of justifiable self defense. If on the other hand, as the State contends, the defendant challenged the fight and provoked the deceased to it, by the handling of the revolver, he cannot claim the benefit of this defense. Wharton on Homicide, Sec. 482; Wharton on Criminal Law, Sec. 485; Roscoe's Criminal Evidence, Sec. 768; 21 Cyc., 800.

But the difficulty with this part of the defense is that we think the jury were warranted in believing that the defendant's story was not true. Besides the fact that the defendant in anger or resentment had armed himself with a revolver, and had followed the deceased to his stable,—strong evidence of premeditation and design,—there is credible evidence, aside from the dying declaration of the deceased, that at the time the shots were fired, the men were not in any such death-grapple as the defendant describes, nor even near each other. An examination of the body of the deceased showed that three shots took effect. One passed through the flesh in the region of the hip. Another penetrated the left breast. A third penetrated the abdomen eight inches to the left of the navel. And the evidence is undisputed that neither upon the clothing of the deceased where the bullets passed through, nor upon or about the wounds on the body, was there any mark or indication of powder or burning. An expert witness introduced by the State, apparently competent and well qualified, testified in effect that such marks and indications would necessarily appear in case of a revolver discharged at no greater distance from the body than that described by the defendant. This witness said that in his opinion, to produce the characteristics of the holes in the clothing, the revolver, when discharged, could not have been less than five feet from the body. This testimony was in no way rebutted, and it does not seem unreasonable. Moreover, we may add, the wound in the left breast is not accounted for by any movement or position that the defendant describes.

Accordingly, we conclude that the jury were justified in rejecting the claim of self defense set up by the defendant. And the defendant's story being discredited, as well it might be, the evidence, beginning with his threats, followed by his procuring the revolver, his following the deceased to the stable, and his shooting him almost immediately afterwards, is ample to warrant the conclusion that the homicide was premeditated and deliberate.

*Appeal denied.*
*Judgment on the verdict.*