STATE OF MAINE *vs.* ERNEST HUDON.

Cumberland. Opinion, April 8, 1947.

*Richard S. Chapman,* County Attorney for Cumberland County.

*Daniel C. McDonald,* Assistant County Attorney for Cumberland County, for the State.

*Henry H. Franklin*

*Harry E. Nixon,* for respondent.

SITTING: STURGIS, C. J., THAXTER, MURCHIE, TOMPKINS, FELLOWS, JJ.

TOMPKINS, J. The appellant, Ernest Hudon of Freeport, in

the county of Cumberland and State of Maine, was indicted by the grand jury for assault with intent to commit rape on one Thelma Collins of Brunswick, in said county of Cumberland. The indictment charges that the assault took place at said Brunswick on the 14th day of September 1945. On trial the respondent pleaded not guilty. Trial was had and a verdict of guilty was returned by the jury. The respondent was sentenced by the presiding justice to a term of ten years in the State Prison. He seasonably moved that the verdict be set aside and a new trial granted for the following reasons: (1) because it is against the law and the charge of the presiding justice; (2) because it is against the evidence; (3) because it is manifestly against the weight of evidence in the case. The presiding justice denied the motion. The respondent took an appeal from the denial of said motion by the presiding justice to the Law Term of the Supreme Judicial Court.

There were no exceptions taken to the charge of the presiding justice, and no requested instructions were refused. The errors complained of are now raised for the first time under this appeal. Respondent claims he has not had a fair and impartial trial because the court below erred in delivering a prejudicial charge which amounted to a denial of the respondent's fundamental rights. The respondent is certainly entitled to a fair and impartial trial. Section 6 of Article 1 of the Constitution of this State guarantees him this fundamental right. He complains that the presiding justice in his summation of the testimony placed undue emphasis on the evidence presented by the State, and did not give a proper summation of the evidence presented by the respondent, and gave undue weight to the circumstantial evidence; that the presiding justice gave no definition of reasonable doubt; that in his charge he gave an erroneous instruction to the jury on the law pertaining to the presumption of innocence; that the presiding justice in his charge expressed his opinion upon issues of fact, which is contrary to Sec. 105 of Chap. 100 of the Revised Statutes of Maine.

The testimony discloses that the alleged offense occurred on the 14th day of September 1945. It appeared from the testimony that Thelma Collins was employed at the Bath Iron Works at Bath, Maine. She lived on Main Street in Brunswick, Maine, a little over a mile from the center of the town. She travelled back and forth to her work by bus from the center of the town of Brunswick to Bath along with others who worked in the shipyard. The respondent rode on the same bus and had been in the habit of giving Miss Collins a ride to and from her residence to the bus terminal. The respondent lived in Freeport, Maine. According to the testimony of Miss Collins the respondent made improper advances to her about a week before the offense alleged in the indictment occurred, and she refused to ride any longer with him. On the afternoon of September 14th she ceased her employment with the Bath Iron Works about 3:30 in the afternoon. The bus left at four o'clock. She stated that between 3:30 and four o'clock she went to a diner in the city of Bath and had a meal; that she drank no intoxicating liquors. There was evidence introduced by the defense that she was intoxicated before the bus left Bath, and that she drank after boarding the bus. On the bus she claimed that the respondent apologized to her and asked to be forgiven for what he had done the week before, to which she said "All right." He offered to take her home on this particular day, but before going home he asked her to go into a cafe in Brunswick, and there they each had a glass of beer. After leaving the cafe they got into Mr. Hudon's pickup truck, and from there drove to the gas station on the Portland road and got some gas. Then he drove to a secluded spot on a back road and on the way Miss Collins claimed he brought up their previous disagreement. She quoted him as saying, "Either you listen to me or I'll blow you wide open." She said he then swung his fist and that is all she remembered until she waked up in the hospital. She was semi-conscious for the most of two days, according to the doctor, and remained in the hospital ten or twelve days in all.

The doctor who attended Miss Collins at the hospital testified that when he first saw her at the hospital her face was swollen . . . the swelling was so rapid you could almost see it swell, and the next day her face was almost fifty per cent more than normal size, and that "All over her body you could see sand particles and very small pebbles and little bits of leaves, as if she had been on the ground without any clothing; you could notice that all over her body;" that the state of her consciousness was so poor you could not tell upon examination if she had imbibed any great amount of liquor or not. He further testified that at the time of the trial on January 11, 1946, she still showed a little swelling on the left side of her face.

Another of the State's witnesses, who lived upstairs in the same house in which Miss Collins lived, testified that around eight o'clock in the evening of September 14th, 1945, through a side window he saw a truck leaving the yard, and that he heard groanings and a door slamming, and he looked out of the window and saw Miss Collins on her knees, and she was trying to get the screen door open. He rushed down to her and she had fallen back unconscious. She was stripped to the waist and her face was badly swollen. He took her into the house with the help of a neighbor. Not being able to get a doctor the police ambulance was sent and she was taken to the hospital; that after she returned from the hospital her face was badly swollen and her eyes bloodshot. He also testified that he saw a truck pulling out of the yard; that it was a V8 pickup, '34 or '35; and that he found on the doorstep Miss Collins underpants and they were all wrinkled up and soaking wet. It was raining hard, and Miss Collins was very wet and cold. Another witness testified that when he went to the house where Miss Collins lived, on the night this occurred and before she was taken to the hospital, he found one article of her clothing at the bottom of the steps—a bandanna handkerchief. These articles were identified at the trial as the property of Miss Collins. According to the State's witnesses there was no sign or odor of

alcohol about Miss Collins, and the officer testified that he got close to her and bent over her for that purpose.

Later the respondent's truck was located, and there was found to be bloodstains on the floor, and in the back of the truck a small branch lying on the open part of the truck body. The place where the truck was parked was located and a tree was found from which it was claimed this branch had been broken. They found on the ground a brassiere, and a jacket from the top of work clothes, and one stocking. These articles were identified as the property of Miss Collins in court. The ground in the vicinity where these articles were found had been disturbed. A warrant was issued and the respondent was arrested that night. According to the testimony of the police officers the respondent's speech was coherent and he was perfectly normal. On questioning by the officers respondent made certain admissions. These were made without threat or inducement. One of the officers testified that the respondent told him Miss Collins had been drinking, and that on her way down Main Street going towards her home she went crazy in the truck and started taking off her clothing and throwing it out of the window, and that the respondent admitted he had struck her because when he got to her house she would not get out of the truck. On further conversation with the respondent he admitted that he went parking with her because she went crazy in the truck, and that he took her up into the woods to try to quiet her down, that she went running through the woods banging up against trees, kind of went crazy, and he couldn't do anything with her, and that he finally got hold of her by the neck and pulled her down to the ground and got on top of her and held her, but hadn't penetrated her in any way. The witness further testified the respondent was arraigned the next morning in the Brunswick Municipal Court, and when asked said he did not want an attorney. After the warrant was read to him and explained to him by the judge of the court, and he was told it was a very serious charge, he pleaded guilty. The witness fur-

ther testified that the respondent's hands were cut, and there were marks on his hands that resembled teeth marks.

The testimony further disclosed that the respondent stated to the officers that he had stopped at her house and continued from there to the woods to .see if he couldn't quiet her down. He didn't think he should leave her at the house in the state she was in; that when he brought her back from the woods where the truck was parked he pushed her out of the truck. The respondent denied that he ever made any improper proposals or indecent gestures towards Miss Collins. He claimed that when they took the bus at four o'clock, from Bath, Miss Collins was drinking and that she drank from a bottle of liquor that was being passed around, and when they arrived at Brunswick she wanted one more glass of ale, and that when they left the beer tavern in Brunswick Miss Collins was staggering; that he tried to drive her directly to her home; that when he stopped there she was acting so bad that in order to save a disturbance around there he went down the road further; and that he tried to sober her off. He went down the road from her house about a quarter of a mile and, as there were cars going by, he took her to a side road where they would be out of sight, as he did not want to have her arrested, and parked the truck, and that when he parked the truck, she unlatched the door and fell out on her face and rolled over. He tried to help her up and she started taking off her clothes and throwing them on the ground, and went through the woods and fell down three or four times, and then he sat in the truck while she was running about. It was raining very hard. Finally he helped her back to the truck, and when he told her she was going home from there she "Took a sling at me, and" he said "I knew with her size and all if it would connect with me it would be too bad, so I up and let a drive at her with my fist on the jaw" and then she sobered up and said "Take me home," and he did so. According to the respondent it was about 6:50 in the afternoon. When he returned to her house the second time he said that Miss Collins

got out of the truck herself and walked toward her door, and that he went directly home, arrived there about 7:15, and told his wife what had occurred. He further stated that he did not remember when his wife got him up that night, when the officers came to arrest him, and that he did not remember going to the police station, that he did not remember making any statements to the officers as to what had happened, and he did not remember about going to court the next day. There was further testimony by the respondent's wife that she and the respondent drove around by Miss Collins' home sometime about eight o'clock that evening on their way back from the grocery store. Three other witnesses testified that Miss Collins had been drinking before she took the bus from Bath on the afternoon of September 14th. Such is some of the sordid story contained in the record.

The respondent claims that the presiding justice in his charge was unfair in the summation of the testimony, that he placed undue emphasis upon the evidence presented by the State, and gave undue weight to the circumstantial evidence. "The law is well settled that if a trial judge sees fit to summarize the evidence for the jury's benefit he must do so with strict impartiality, and must not magnify the importance of the proofs on the one side and belittle them on the other." *State* v. *Brown*, 142 Me., 16; 45 A. (2d), 442. The latter case, however, was not decided on that point. It was decided on the exception by the respondent to the refusal of the judge to give a requested instruction on the presumption of innocence. An examination of the testimony discloses that it is heavily weighted in favor of the State. If, as claimed by the respondent, the charge bore somewhat strongly against him, the testimony as reported shows that it is no less decided in its bearing the same way. That this is so is the fault or the misfortune of the respondent. It can hardly be expected that the judge in his charge shall allude to all the testimony developed through a long trial, and if any material omission or misstatement occurs it is the privilege and

the duty of counsel to call the attention of the court to it at the time, otherwise all grounds of complaint are waived. "If the tower leans it would hardly be excusable to give the impression that it stood upright." *State* v. *Reed*, 62 Me., 129. We are unable to discover wherein the respondent has suffered any injustice in the summation of the testimony by the presiding justice.

On appeal, where no exceptions are reserved, the only question before the court is whether, in view of all the testimony in the case, the jury is warranted in believing beyond a reasonable doubt, and therefore in finding, that the respondent committed the crime alleged in the indictment. *State* v. *Lambert*, 97 Me., 51, 53 A., 879; *State* v. *Albanes*, 109 Me., 199, 83 A., 548; *State* v. *Meulkerrin*, 112 Me., 544, 92 A., 785; *State* v. *Priest*, 117 Me., 223, 103 A., 359; *State* v. *Peiteantonio*, 119 Me., 18, 109 A., 186; *State* v. *Papazian*, 124 Me., 378, 130 A., 129; *State* v. *Pond*, 125 Me., 453, 134 A., 572; *State* v. *Smith*, 140 Me., 255, 37 A., 2d, 246.

The court has on certain occasions reviewed questions of law both on motion for new trial and on appeal even though exceptions were not taken. *State* v. *Wright*, 128 Me., 404, 148 A., 141; *State* v. *Mosley*, 133 Me., 168, 175 A., 307; *Trenton* v. *Brewer*, 134 Me., 295, 186 A., 612; *Springer* v. *Barnes*, 137 Me., 17, 14 A., 2d, 503; *Megquier* v. *D. Weaver*, 139 Me., 95, 27 A., 2d, 399; *Cox* v. *Metropolitan Life Ins. Co.*, 139 Me., 167, 28 A., 2d, 143. However, such review is not compatible with good practice and has been condemned from time to time in various decisions of the court in this State. *State* v. *Smith*, 140 Me., 255, 37 A., 2d, 246.

It is objected that the court in his charge to the jury omitted to define to the jury trying the case the legal meaning of the expression, a reasonable doubt. The justice stated, quoting from the charge, "As I have told you before the burden is on the State to satisfy you beyond a reasonable doubt that the crime alleged in the indictment has been committed. I am not going to

define reasonable doubt because I have done that on at least two occasions within a day or two and the definition of the term must be still fresh in your minds." The term reasonable doubt has been variously defined, but "It would seem that the phrase reasonable doubt explains itself. Certainly the meaning is obvious and will readily be appreciated by every juror without further explanation." *Battle* v. *State*, 103 Ga., 53, 29 S. E., 491. Mr. Bishop in his 2nd Edition on Criminal Evidence, Pleading and Practise, at Par. 1094 says: "There are no words plainer than reasonable doubt and none so exact of the idea meant. Hence some judges, it would seem wisely, decline to attempt to interpret them to the jury. Others deem that some explanation should be given, especially if requested, or deem the neglect to make the request justifies the omission." Cited in *State* v. *Rounds,* 76 Me., 123; *State* v. *Blay,* 77 Vt., 56, 58 A., 794.

Our own court in *State* v. *Reed,* 62 Me., 129 at 142 says:

"The explanations of the meaning of this phrase have been almost innumerable and the best jurists have often found it difficult to convey to their own satisfaction the idea in their own minds expressed by its use. Not that there is any considerable difficulty in understanding its meaning, but rather in conveying it. It may indeed admit of grave doubt whether the proposition is in itself so simple and the words so well calculated to express the state of mind so easily felt though difficult to describe, that in some cases it is sufficient to use the expression without any attempt at explanation. All such attempts must result in simply stating the same proposition in a different form of words, and words that are, perhaps, no more easily understood. There is no exact mathematical test by which we can certainly know whether the doubt, entertained in any given case, is reasonable or otherwise. What would be reasonable to one person might be far otherwise to another. Therefore, no certain line, as upon a plan, can be drawn, that shall be

recognized by everyone as the dividing line between the mere skeptical doubt and that which has the sanction of reason. Hence, whatever explanations may be given of the phrase, its meaning practically must depend very largely upon the character of the mind of the person acting. We must assume that jurors are reasonable men, and as such they must be addressed. When told that, in order to convict, the proof must remove every reasonable doubt of guilt from their minds, whatever the form of words used, if any heed is given to the instruction the result must be that each individual juror will understand it and act according to the dictates of his own reason; and if, tried by that test, the doubt is reasonable, conviction must fail; otherwise it would follow."

The court charged the jury on the presumption of innocence as follows: "There is here, as I have said before, a presumption of innocence which is about this individual until he comes into court, and, as I have said to you, the mere fact that he has been apprehended, indicted and tried, was no evidence of his guilt whatsoever. He starts even when he comes into court, and if the State convicts it must convict on the evidence produced in court and not on any of the preliminaries which must necessarily take place before the respondent is put on trial." This was an erroneous statement of the law in that the jury could have understood from this, that when the case opened the presumption of innocence was gone. The presumption of innocence continues with the respondent throughout all stages of the trial and until the case has been finally submitted to the jury and the jury has found that this presumption has been overcome by the evidence of the State beyond a reasonable doubt as to each and every material fact.

"Presumption of innocence is founded on the first principles of justice, and it is intended, not to protect the guilty but to prevent, so far as human agencies can, the conviction of an

innocent person." C. J. Vol. 22, Par. 587; *Burnham* v. *Hazelton,* 82 Me., 495, 20 A., 80, 9 L. R. A., 90. Where no exceptions are taken the court will not exercise its discretionary power to disregard the absence of objections unless on the whole case there is a reasonable basis for the fear that injustice has been done. *People* v. *Semione,* 235 N. Y., 44, 138 N. E., 500; *People* v. *Eimleta,* 238 N. Y., 158, 144 N. E., 487; *People* v. *Odell,* 230 N. Y., 481, 130 N. E., 619; *State* v. *Cary,* 124 Kan., 219, 257 P., 719; *State* v. *Smith,* supra. While we do not approve of the instruction complained of we find no reasonable basis for fear that injustice has been done to the respondent as a result of the erroneous instruction.

The respondent complains that the presiding justice in his charge expressed his opinion on issues of fact, which is contrary to Sec. 105 of Chap. 100 of the Revised Statutes of Maine. The section referred to commands that "During a jury trial the presiding justice shall rule and charge the jury, orally or in writing, upon all matters of law arising in the case, but shall not, during the trial, including the charge, express an opinion upon issues of fact arising in the case, and such expression of opinion is sufficient cause for a new trial, if either party aggrieved thereby and interested desires it; and the same shall be ordered accordingly by the law court upon exceptions." Rule of Court 18, among other things, makes the following provision: "Exceptions to any opinion, direction or omission of the presiding justice in his charge to the jury must be noted before the jury, or all objections thereto will be regarded as waived." When counsel regards the charge as an expression of opinion by the presiding justice he should request the court to rectify the mistake or take his exception as the Statute and Rule of Court provides, before the jury retires. His failure to do so is regarded as a waiver of any objection arising from that source. *State* v. *Benner,* 64 Me., 267; *Grows* v. *Maine Central R. R. Co.,* 69 Me., 412; *Murchie* v. *Gates,* 78 Me., 300, 4 A., 698; *Elwell* v. *Sullivan,* 80 Me., 207, 13 A., 901; *State* v. *Richards,* 85 Me., 252, 27 A.,

122; *State* v. *Jones et al,* 137 Me., 137, 16 A., 2d, 103. "It does not follow that the judge has expressed an opinion upon the issue because his opinion may be inferred from some allusion which he may make to some obvious and indisputable fact: nor because an inference favorable or unfavorable to the position taken by one of the parties may be drawn from such obvious truth or fact." *McLellan* v. *Wheeler,* 70 Me., 285; *State* v. *Jones et al,* 137 Me., 137, 16 A., 2d, 103, supra.

"A judge presiding in a court of justice occupies a far higher position and has vastly more important duties than those of an umpire. He is not merely to see that the trial is conducted according to certain rules and leave each contestant free to win what advantage he can from the slips and oversights of his opponent. He is sworn to 'administer right and justice.' He should make the jury understand the pleadings, position and condition of the litigants. He may state, adjudge, compare and explain evidence. He may aid the jury by suggesting presumptions and explanations, by pointing out possible reconciliations of seeming contradictions, and possible solution of some difficulties. He should do all such things as in his judgment will enable the jury to acquire a clear understanding of the law and the evidence and form a correct judgment. He is to see that no injustice is done." *State* v. *Jones,* supra. We find no expression of opinion in the charge that would cause such injustice as to warrant a reversal.

In the present case no exceptions were taken to any claimed omission in the charge, or to erroneous instructions, or to the claimed unfair summation of the testimony by the presiding justice, or to his claimed expression of opinion or questions of fact arising in the case. In *State* v. *Smith,* supra, our court said:

"This court has in certain cases reviewed questions of law both on motion for new trial and on appeal though exceptions were not taken. Such review, however, is not compatible to the best practice, and although there be

error in an instruction, when no exception is taken, a new trial either on appeal or motion should not be granted unless the error in law was highly prejudicial and well calculated to result in injustice, or injustice would inevitably result, or the instruction was plainly wrong and the point involved so vital that the verdict must have been based on misconception of the law, or when it is apparent from a review of all the record that the party has not had the impartial trial to which under the law he is entitled. We consider the foregoing applicable as well to omissions as to erroneous instructions when no exceptions are taken."

The respondent's attorneys were of his own selection. They were asked by the court if there were any exceptions or requested instruction. If the respondent desired further amplification or correction in the court's charge they should have requested it. Attorneys for the respondent are in court for the purpose of protecting their client in every legitimate way. They are officers of the court. They should not lie in wait to catch the court in error for the purpose of obtaining a reversal. They should claim every right of their client at the proper time as the case progresses. *State* v. *Cary*, supra; *State* v. *Smith*, supra. A study of the entire record, viewed in the light most favorable to the respondent, convinces us that the jury was warranted in believing beyond a reasonable doubt, and therefore in finding, that the respondent was guilty as charged. Other objections have been considered but we find no error which would warrant a reversal. We hold that the case under consideration does not come within the exception to the general rule laid down in *State* v. *Smith*, supra. No injustice has been done the respondent.

*Appeal dismissed.*
*Judgment for the State.*